Morning, Your Honor. This is not a run-of-the-mill IPR appeal. The Board here invalidated OSI's groundbreaking claims to treating non-small-cell lung cancer based on references that disclose no data regarding erlotinib and non-small-cell lung cancer, not even in a preclinical trial. Can I just double-check something? The briefs seem to agree with each other that the only indicated condition that needs to be discussed is the non-small-cell lung cancer, even though there are a couple of others in the claim. Is that because nobody has suggested there's prior art on those other conditions? Correct. The challenge below is solely about non-small-cell lung cancer. So that was the focus. And so you have no data about that, even in preclinical models. The Board then tried to backfill with speculation based on the mere initiation of clinical trials that there must have been hypothetical preclinical evidence. Can I ask you something about that? On the preclinical evidence, I think the only thing that's in the records for that is expert testimony that there would be animal studies or mammal studies before Phase I studies could occur. Is there any evidence at all on what those studies would have sought to treat? For example, would they be for other conditions other than non-small-cell lung cancer? I mean, do we know? Do you know what the criteria is for those kind of clinical testings that would allow the Phase I testing to occur? Right. It doesn't have to be testing in non-small-cell lung cancer. Phase I trials can be done in healthy volunteers or in a mix of cancer patients. Are you talking about the preclinical animal studies? Right, right. But I'm saying because that's what you're going towards, you don't need to do preclinical mouse studies in non-small-cell lung cancer to be advancing there. And in fact, there's no evidence anywhere in the record that such studies were done. The only... And on this point, that the preclin... I gather there was some testimony or declaration or something that says, when you have a Phase I study, we think there should have been some kind of preclinical testing. There is that kind of declaration, right? Right. In the deposition of one of our experts, he said, you'd have a lot of things you'd show pharmacology, toxicology, preclinical efficacy. But then your point is that, is there any evidence that somebody declare or say in a deposition that there would have been or we would expect there to have been in the preclinical testing leading to the Phase I testing of non-small-cell lung cancer? Absolutely not. Okay. No evidence on that whatsoever. So it's a huge speculative leap that the board is making here that isn't grounded in any evidence. And that's the basis on which principally, maybe even solely, you attack the reliance on the 10-K. Right. That was the basis on which the board actually relied on the 10-K. And so focusing on its reasoning under Chenery, we say that reasoning can't stand. Is that also the basis for which the board relied on the table in Gibbs? Yes. And then, so Gibbs has a table that just says Phase II, doesn't even say what's being tested in Phase II. And so all that leaves, when you take out this leap about the preclinical trials, all that leaves is the statement in Gibbs, which the board latched on to the idea that this statement begins with the term, these compounds, and this is on Appendix 1406. But the actual reference to non-small cell lung cancer in that statement was in an exemplary clause at the end. Begins with the word, particularly. It's singling out a particular attribute here, and not necessarily, even on its face, applying to both compounds. And more importantly, statements like that, and this course has been very clear, need to be read in context. And Gibbs, in that paragraph, cites two references. The Woodburn reference, which is about Gafitinib, an entirely different compound, discloses anti-tumor activity in non-small cell lung cancer. The Moyer reference, which is actually about Erlodinib, is entirely about head and neck and colorectal cancer. It's undisputed that there's nothing, no disclosure of activity in non-small cell lung cancer in the Moyer reference. And the reason that you think context for the relevant sentence, the however sentence, would look to Moyer and the other one, is that, what, those are 12 and 13 in the two sentences above it? Right. I mean, they are the two references that are cited in that section. Woodburn and Moyer. Right. And a person of ordinary skill who has this statement that's ambiguous, what are they talking about for non-small cell lung cancer, is naturally going to say, well, what is the reasonable expectation of success? And you look at those references, and one's about another compound and talks about non-small cell lung cancer. The one about Erlodinib doesn't talk about non-small cell lung cancer. That's pretty strong context saying this statement is not giving you an expectation of success in non-small cell lung cancer. Trace, are you asking us to clarify the legal meaning of reasonable expectation of success to say that a person of skill in the art would not have, as a matter of law, a reasonable expectation of success based on a sentence that points to two references without going and looking what those references say to make sure that the sentence is read one way rather than another? Right. I mean, I think that is an available route here. It could be phrased in those terms, it could also just be presented in substantial evidence terms getting to the same result in terms of that bare sentence where these references are pointing to saying, well, this isn't a disclosure about Erlodinib and non-small cell lung cancer. That isn't substantial evidence to support this. And at the very least, as a procedural ground, the board can't do what it did here, which is it looked at Gibbs. Gibbs actually had a hole in it, and the board says, well, we have to look at Gibbs in context. And it relies on the Moyer article to fill that. And what was the hole? The hole was that Gibbs used the chemical code name. Oh, right. They never disclosed what it was. So they said, oh, of course we would read this in the context of the underlying references. They looked to Moyer to fill that hole, but then it wouldn't look to the underlying references to understand the key sentence. In your brief, you have a suggestion that they erred legally in how they interpreted the reference by not interpreting it as a hole, I guess, or interpreting that language in context. And you contrast with that with the situation where it was the code name for Erlodinib. Is that really a legal error? How does that operate when we know that Erlodinib says that what a prior art reference teaches one of ordinary scaly art is a question of fact? Well, but you have two. You said it's a question of fact, but you've also said that the reference has to be read in context. And the reference is read for everything that it teaches. And so when the board looks at that one isolated portion and isn't considering that context, then it's put itself in a position where it doesn't have a fact finding to be deferred to there. And by the way, this is all reinforced by the fact that Gibbs, at the beginning of the article, also says, you know, to the extent you want to learn more, look at the proceedings, these two 1999 proceedings and the abstracts there. And we asked Apotex's expert about those proceedings. And he said, this is Appendix 4571, question, so you looked at these proceedings and did not find anything that you relied on to support your opinion. Is that right? Answer, correct. So again, it's reinforcing, not only is there this clear contrast between Woodburn and Moyer, but when you look to the background of the only other proceedings that are cited there, there's also not showing any evidence in non-small cell lung cancer. And in fact, their expert, we have a straight up concession in this case that he is not aware of any preclinical or clinical data before the priority date regarding non-small cell lung cancer. Now, regarding the data, you lead with that issue in your brief, but you're not suggesting, oh, this is my question, are you suggesting that the only way that they could have shown reasonable expectation of success was data because of the nature of treatment of cancer? No, I'm not sure it's the only way, but you certainly, it's undisputed that this is a highly unpredictable arch. I mean, their expert admitted, quote, the odds of finding successful treatment for non-small cell lung cancer, at least as of the 2000 time period, were not good. It's Appendix 4615. So do I understand that maybe your argument is that all these references have holes and one way they could have filled it up is with data and they haven't done that here? Or is it more that they had to have data? That's what I'm trying to understand. Right, but it's not, we're not arguing a per se rule, but in the context of a highly unpredictable arch here, and when we talk about data, I mean, whether it's the underlying data itself or whether it's the disclosure of the results, that's what a medical oncologist here making these decisions is going to need some sort of scientific evidence before being able to reasonably conclude. But not necessarily to see the evidence. There could be a highly reliable representation that such evidence exists. So that if, I thought that the board said something like, that's kind of what that sentence from Gibbs is standing alone, a highly reliable indication that, of what's being asserted until you go and look at the two citations that clarifies that actually that couldn't really be what he was saying. Right. And so that doesn't, you have to look at all of those together as a package. And when you look at the actual testimony that they're applying. Right, but if there's an article in the New England Journal of Medicine at the beginning of phase three studies that says, we expect this to happen based on information we have, that might well be a sufficient basis for finding a reasonable expectation of success, even if the skilled artisan had no access to that data. Right. If someone's reporting on their own experiments, for example, and they're not reporting the underlying data. But what we have to remember here is Gibbs here was a review article. Gibbs was canvassing what other people had reported and wasn't saying, I have undisclosed knowledge here about erlotinib. And so that has to be read in light of those references. And Gibbs cites Moyer, Woodburn, and these abstracts, and you don't see any of the results here regarding non-small cell lung cancer. And so their expert, when pressed about this, admitted, said, well, I think Gibbs would be saying something important here, but then admitted that he would look to the underlying references being cited. And then his final line of argument was, he said, well, I would call it. I would call Dr. Gibbs. And so to check that box, we did call Dr. Gibbs, and he came and testified as a fact witness in this case, and confirmed, you know, I didn't do the testing here. I didn't have any knowledge that this was going to have an effect in non-small cell lung cancer. And the board's only response to that was the circular argument. They said, well, you didn't correct your article. But that assumes that we have an unambiguous disclosure here. And as we've talked about from the beginning, this is an ambiguous sentence that gets read in light of these other references, that there's nothing there that needs to be corrected by Dr. Gibbs. This is like your analogy in your brief to the baseball players with the opening pitcher and the closer. Yes, exactly. And I haven't, I mean, there was no response in the response of brief to that basic point that you can't just say on the face of that sentence, necessarily, this is erlotinib. And particularly when you're not talking about, with no offense, you're not talking about a lawyer's game here. We're talking about what is a medical oncologist going to rely on to say, I expect this is going to treat non-small cell lung cancer. And in that circumstances, that ambiguous statement on the face of the reference isn't going to be enough. And when it's read in context with the underlying references, you're going to say there isn't the evidence here about non-small cell lung cancer. Let's hear from the other side, and we'll save your time. Mr. Tublin, have you divided your time? Have you divided your issues? Yes, Your Honor. I will take 10 minutes, and the government is going to take five minutes. Okay. May it please the court, OSI's argument that a person of ordinary skill in the art would need clear, vetted scientific evidence, and that the board misapprehended the reasonable expectation of success requirement is predicated on too high of a standard for reasonable expectation of success. OSI is requiring absolute vetted data, which would be an absolute predictability of success. I'm sorry, what's absolute vetted data? I thought their point was there turns out to be actually no evidence of any clinical testing on humans or animals of this compound for this condition. There is evidence that there was data that was done. In fact, when we read Gibbs, the Gibbs reference, the Gibbs reference refers to these compounds were tested in preclinical models. Let's just assume for purposes of this question that that sentence is on its face obviously imprecise, and so you would, in fact, look at the two expressly cited references, 12 and 13 by number, and Moyer and Woodburn by name, and you would immediately see that's not actually what it meant. So what evidence is there that when checked in the most minimally responsible way would show that there was preclinical testing of this compound for this condition in humans or animals? Looking at Gibbs the way that that particular paragraph is laid out, the two specific references that are addressed there address a completely different sentence. And those specific references actually modify a sentence that demonstrates that these two compounds were in clinical trials. It's not until two sentences later where we see that Dr. Gibbs is referring to these compounds, only talking about two. Can I ask you something? So the only evidence is Gibbs? That's the only evidence of any clinical testing of this drug for this condition? I actually think that not only Gibbs, but I also think that the board is allowed to make inferences based off of the testimony that Dr. Bond and Dr. Giacconi both gave. When we look at OSI's 10-K and we look at the Gibbs reference, what we see is that they finished the phase one trials and began phase two trials. Now when asked about that, asked about investigational new drug applications and investigator brochures, Dr. Bond said, yes, there would have been preclinical data that would have been submitted and there would have been targeted conditions. Did he say that that preclinical data would have been about using this compound for this condition? I think his overall statement was, and you have the preclinical efficacy data. I think the answer is no, he did not say that. But I also think that he said that the therapeutic conditions would have been listed in there as well. Where did he say that? I have to look at the record. I think it's at 2023, ABX 2023. I agree. What line are you looking at? Okay.  So here we go. I'm sorry. APPX1992. And we look at lines five, or we look at lines eight through five. I think there's testimony about the therapeutic indications. Eight through what? Eight through, going to 33-5. Dr. Bunn testifies that many drugs would not be called targeted, so generally you would list the indications that you were going to study in the clinical trial that has to accompany or specify what patients are being included. So that's identifying what you're going to study in the phase two trials, right? It doesn't identify anything about what was previously done. I think that it identifies the preclinical data, but also identifies the therapeutic. But it identifies the therapeutic targets that they intend to study in those particular trials. But I think that looking at the – looking for – Do you know of anything that – I mean, I'm just trying to understand here. Sure. Understand how it works. Do you know of anything that says that in the preclinical, and before you could have phase one trials, that you have to do preclinical work on particular conditions that you've – or targeted indications that you've identified in your investigator's brochure? As part of the record, I can't identify anything that says that specifically. But I would say that when we look at requiring data, I would say that that would be an absolute predictability of success. What we have here is that when we look at Schnur and the board looking at Schnur, the board found that Schnur had – I guess I don't – I mean, that seems to me to be a leap. That is, it's one thing to say, I have some data or a reliable representation that some data exists. And what that data reliably tells me is this looks – and now I'm going to use some non-legal word – promising, something like that. It doesn't mean absolute – you know, I've looked at this data and the data – maybe the data says this is spectacular. There's no doubt at all. But there's a large amount of room on the spectrum between that and there is some data that begins to give me some expectation, you know, using my reasonable scientific methodology in my head. I think that the board and its factual findings made a reasonable inference based off the testimony of Dr. Bond and Dr. Giacconi about preclinical data being done. But I also second that if we look at the Gibbs reference, the board made factual findings on the Gibbs reference and what a person of ordinary skill in the arts, how they would read that specific reference. And looking at that specific reference, when it says these compounds had been through preclinical studies, had good anti-cancer activity, and had a good therapeutic index, particularly in patients with NSCLC, the board looked at testimony from Dr. Giacconi. The board looked at testimony from Dr. Bond, looked at testimony from Dr. Gibbs. And the board made factual findings saying a person of ordinary skill in the art would know that preclinical studies had been done and that patients had been treated with erlotinib to treat NSCLC successfully. And that's enough for a reasonable expectation of success. Can I ask you about Schner? You were mentioning it earlier. I read Schner as disclosing at least 105 different compounds, most of which are described as being preferred, and then disclosing that there's a list of indications that could be treated. But I don't see anywhere where it says that erlotinib could be used for lung cancer. Nowhere do I see it linking that. I'm just forgetting about the non-small cell lung cancer issue. But am I correct in my understanding of that? There's no place in that reference where it links the two at all. I think that the Schner reference actually claims erlotinib as one of, I think, probably 43 compounds. Schner also claims that these compounds in a therapeutically effective amount in mammals can be used to treat hyperpolyptic disorders, including lung cancer. So you say that the claim that's directed to erlotinib also has within it, somewhere along the chain of claim elements, that it treats lung cancer? Is that how you're connecting them? I think if we look at the claims themselves, we see the therapeutically effective amount in mammals, and we also see that some of the conditions listed, one of those being lung cancer. We also have disclosure in several spots in Schner where the compounds could be used to treat lung cancer. The therapeutically effective amount that's given in Schner is the effective dosage amount that is given in the 221 patent for that particular. If you look at, if we do a gram factor analysis, and we look at the second gram factor, and we look at the scope of the prior art compared to the challenge claims, if we look at what the challenge claims require, it only requires therapeutically effective amount in mammals. It doesn't require Phase II, Phase III studies. It doesn't require clinical efficacy in humans. If you look at the 221 specification itself, it only has preliminary data from a Phase II trial where the inventors, the only conclusion they can make, is that erlotinib is active in NSCLC. And when Dr. Bunn was asked about such preliminary data, he said, that's not enough information to a person with a skill in the art to determine whether it was effective in treating humans, NSCLC in humans. And so when we look at that second gram factor, and we look at what's required for disclosure of the prior art, we see that Schner has everything you need except for the identification of NSCLC. And you have contemporaneous references. You know, from a medical point of view, using the compound for the right condition seems like not a small thing. I'm sorry, using the compound? For the right condition as opposed to a different condition seems like not a small detail. Well, the compound, I think the compound among is a preferred compound that is listed as therapeutically effective amount to treat lung cancer. And what the case law tells us is that Schner is enabled for everything it discloses. OSI never, OSI never argued before the board that Schner was not enabled. So it's enabled for a therapeutically effective amount in mammals to treat lung cancer. The only thing missing is the NSCLC. And looking at Gibbs, looking at OSI's 10K, they specifically point out erlotinib, specifically point out NSCLC. And so in view of those, looking at Schner, in view of those two references, it's right there, right there for a person born with a skill in the art, given what the challenge claims. It's there if you put them together, knowing what happened. If you, so a person born with a skill in the art, looking at those three references, they would have combined those references because they all deal with EGF receptor. But they didn't combine them. The person born... Is this patented combined? The Gibbs and OSI's 10K were never before the patent office, only Schner. And when faced in prosecution with Schner, the only argument that OSI made against the Schner rejection was that Schner did not disclose NSCLC. Gibbs and OSI's 10K give us that information specifically about erlotinib. They give us the information that NSCLC is the cancer that is of two lung cancers. There's only two. SCLC and NSCLC. Not a big genus. Only two. And a person born with a skill in the art, knowing at that particular time that 80% of lung cancers are NSCLC. And the only one that overexpresses the EGF receptor is NSCLC. So you're looking at the disclosure of Schner and saying, hey, look, this is lung cancer. It's probably NSCLC. And then you get Gibbs and OSI's 10K, and they say, yes, it is. It is NSCLC. That is what it is. But they didn't do the clinical trials. They didn't proceed with the FDA approvals. This is the problem, is it not? Where the line is drawn when there is such a significant distinction in terms of the combination of the public benefit and the cost of proceeding to serve the public. I think that from Gibbs, a person born with a skill in the art would look at that statement and say, three clinical trials were done, and patients were treated with NSCLC successfully by NSCLC. That's enough for a reasonable expectation of success when you look at Gibbs and when you look at Schner together. And I think the fact that Schner is enabled for all it discloses, has a therapeutically effective amount to treat mammals, the same disclosure as in the 221 patent, and it has lung cancer, that it can't be ignored that it is enabled for everything it discloses and that efficacy data is not required for looking at Schner. And now you've exhausted your colleague's time. Do you still want us to hear from him for a couple of minutes? Yes, Your Honor, if that's okay. Thank you for your time. Thank you. That's good. Good morning. May it please the Court. Dennis Vann on behalf of the United States on the constitutional issues in which we've intervened on. Obviously, this Court has heard many of these issues a number of times already, and so if there are no questions, I'd just briefly like to address the waiver point. In many of these cases in which... Waiver of what? Waiver by not presenting arguments before the Board, and of course it's the... And this is about the retroactivity... How that fits with oil states and other issues. This is not the case-specific issue. You're telling us the official position of the United States is any argument that's not raised explicitly and fully developed is deemed waived as a matter of national policy or what? No, I mean, every one of these questions is case-specific. This Court obviously has discretion to excuse waiver in any of these cases, and the government has submitted a fully developed brief for the purpose of this Court resolving these questions in any given one of these cases. Let me ask you a question about waiver in that case. Here we have a situation in which the government has granted a property right. We can debate whether it's personal property or a franchise or whatever. It is a federal grant. The same agency that granted it now comes forward and says we made a mistake. We shouldn't have done so. That's the decision which is being appealed. We made a mistake. In that case, when the United States comes forward and confesses an error, concedes that they made a mistake on which the patentee relied to the tune of, I don't know how many billions of dollars through the clinical phases. What is the government's responsibility for that mistake? We've crossed the bridge that there is an opportunity in the law for this agency to correct its mistake. Why is this any different from any other Fifth Amendment liability for government action that is obligatory? You mentioned it in your briefs, so obviously you've thought about it. I'm happy to address, and I take it to be some type of due process or takings concern that you're raising here, but of course there's Patlex in this Court already controls both the due process. Patlex did not deal with, Patlex said that it was not forbidden for the agency to correct its mistake. Patlex did not raise the question of having corrected the mistake, shouldn't the government face the consequences of its error? Right, and I don't think there's any type of claim here that the government should somehow pay money or to face other types of- Then why did you brief it? If there's no claim, why did you brief the Fifth Amendment? Because in the opening brief in this case, they've raised constitutional challenges. This Court issued a Rule 44 certification asking the government whether they would intervene to address the constitutional challenge in this case. Their theory is that because there would be some sort of due process or takings issue that the government's IPR action couldn't proceed at all, that the government couldn't even go through inter partes review, not that there should be some back end consequence against the government once inter partes review is completed. So here we have a specific commitment that was made in reliance on the government action. And I understand that, of course, when somebody has issued a patent, they do have some type of, you know, they have a property interest, they use that, they've gained the benefit of that for a number of years, and whenever a patent owner receives a patent, they have the benefit of that patent. And that patent is only finally, you know, taken away, if you want to call it in those terms. I think we can discontinue the argument. Thank you. If there are no further questions, the Court should defer. You have your rebuttal time. I want to circle back to a few points. On the investigative brochure, this hypothetical evidence that's being relied on, I mean, we're talking about something that's not in the record and wouldn't even be in the prior art. And so the backfilling that's being done in this testimony from our expert, Dr. Bunn, as I think has been clearly revealed here, is not in any way saying there would be preclinical evidence regarding non-small cell lung cancer. I've got, I think, two questions I'd like a little bit of clarification on, probably unrelated to each other. So by the time of this, by the time of the priority date here, there might have been, there would have been preclinical testing, but there was also the phase one testing. I understand, I think, that there's an argument that was made that the preclinical testing would have had some relevant data. Was an argument made that the phase one process would have had relevant data? Right. An argument was made. The board didn't base its decision on that, and for good reason, which is there's no disclosure in the prior art that there were non-small cell lung cancer patients treated in phase one. The only evidence that was offered was the Hidalgo reference. The post-priority date. Okay. The board said that's not prior. All right. So my second point of clarification, and I may not quite understand what the argument was on the other side, but I thought it was something like this. Schnur, is that the? Yes. So Schnur says for some class of conditions, lung cancer, you can use this. Presumptively enabled. Put that aside for a minute. There are kind of two classes within that lung cancer, the small cell and the non-small cell. When you combine it with the 10K that says you're investigating the non-small cell, isn't that enough all by itself, not only to put the idea in your head, in a skilled artisan's head, that you might use this for the non-small cell lung cancer, but also when combined with what Schnur says or legally implies about enablement to give you a reasonable expectation of success? Is that coherent? Right. I understand the question. And just to be clear on the contours of Schnur, the only disclosures in Schnur regarding treatment are the generic disclosures about compound one. So you're talking about a genus of more than 1,000 compounds and a list of at least 18 conditions. And so this court has recognized in the UCB case we cite in our brief, that there still is a leap to be made from going from a presumption of enablement of a genus to a reasonable expectation of success. And I'd submit, Judge Stoll, your opinion a few weeks ago in Novartis v. Westward had a similar dynamic. There you had the 772 patent disclose derivatives of rapamycin, including Everolimus, and it disclosed that these would be useful in treating tumors. But the leap isn't made from that fact to getting down to the specific treatment. And so what we have in Schnur is we have no disclosure. Erlotinib is disclosed as a compound and claimed as a compound. No disclosure specifically about Erlotinib treating anything, and only this broad genus disclosure that's a prophetic disclosure. And, you know, their own expert when talking about the disclosure in Schnur said here that, well, you know, people, quote, and this is appendix 4541, people, quote, cast a broad net so they would indicate, like in these cases, several tumor types, and then eventually they will test it. So when you're talking about how is someone who's making this decision about, do I have a cancer treatment here going to read Schnur, that's seen as just a prophetic genus claim. That's not, it's hindsight to be drilling down specifically to Erlotinib and lung cancer. And then as for OSI and the others to fill it in, I mean, I think one thing we want to be clear on is OSI talks about potentially targeting. I'm sorry, the 10-K. Sorry, the 10-K, yes. Sorry, the 10-K talks about potentially targeting a lot of conditions. Even in the 10-K when it talks about entering phase two, it doesn't, even that doesn't say we're going into phase two for non-small cell lung cancer. And so you can see this at 4562 in the appendix. This was a question asked by a Texas expert. Question, the OSI 10-K does not specify which indication is being pursued in the phase two clinical trial for CP358774, that's Erlotinib. Correct? Answer, that's correct. So it's a double dose of hindsight here to be reading that for more than the discloses and then to be working backwards on Schnur. And it's well established in this court that you can have species claims issue over genus claims. And so I think if we follow this path that is taking the leap from the presumption of enablement on the broad genus of Schnur, that's a position where I think you then presumptively don't have species claims over genus claims, which would run against a long line of precedent in this court. And particularly, again, when we're talking about Schnur not being accompanied by any data. And we're not saying you have to finish your phase two clinical trial. We're talking about not even the most basic in vitro testing in an NSCLC cell line. You're saying in the context of the prior here that there had to have been more testing with more data. Right. And just a final point on the expectation of success. The Supreme Court in KSR used the term anticipated success. And Judge Toronto, in your writing at the en banc denial stage in BMS Viteva, you talked about this issue and said that the phrase reasonable expectation of success requires the expectation to be reasonable. And said, quote, we've tied the reasonable expectation of success standard to the Supreme Court's use of predictable in KSR. That precedent suggests a higher rather than lower standard for reasonable expectation. And I think that's exactly right. And that's why you've seen in this court's cases a reference to a likelihood of success. When the medical oncologists think here, I am likely to treat cancer with this compound. And in such an unpredictable art with that dearth of scientific evidence we've talked about, you would not have that expectation here. And so the board erred in its bottom line result. And then, as we've discussed, also erred procedurally in reaching that result in terms of its approach to the prior art references and what it was relying on. Thank you. Thank you all. The case is taken under submission.